**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| HARMONY POINTE, LLC, | ) | |
| | ) | Case No.: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF COTTLEVILLE, MISSOURI, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Serve: Amy C. Lewis, City Clerk | ) | |
| 5490 Fifth Street, | ) | |
| Cottleville, MO 63304, | ) | |
| | ) | |
| RICHARD FRANCIS, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| Serve: 4 Matterhorn Ct., | ) | |
| O'Fallon, MO 63366, | ) | |
| | ) | |
| ROBERT RONKOSKI, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| Serve: 42 Fox Hollow Drive, | ) | |
| Cottleville, MO 63304, | ) | |
| | ) | |
| JOHN GNAU, in his individual capacity, | ) | |
| | ) | |
| Serve: 122 Vistalago Place, | ) | |
| St. Peters, MO 63376, | ) | |
| | ) | |
| EMILIE COLOMBATTO, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Serve: 5525 Ashboro Drive, | ) | |
| Cottleville, MO 63304, | ) | |
| | ) | |
| MICHAEL GUCCIONE, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Serve: 2139 Roselake Circle, | ) | |
| St. Peters, MO 63376, | ) | |

MIKE KREKELER, in his individual      )
capacity,                             )
                                      )
    Serve: 5218 Cedarfield Drive,     )
        St. Charles, MO 63304,        )
                                      )
MICHAEL PADELLA, in his individual    )
capacity,                             )
                                      )
    Serve: 201 Houston Street,        )
        St. Charles, MO 63301,        )
                                      )
    Defendants.                       )

## **COMPLAINT**

COMES NOW Plaintiff Harmony Pointe, LLC ("Plaintiff"), by and through its undersigned counsel, and for its Complaint for Damages against Defendants City of Cottleville, Missouri (the "City"), Richard Francis ("Francis"), Robert Ronkoski ("Ronkoski"), John Gnau ("Gnau"), Emilie Colombatto ("Colombatto"), Michael Guccione ("Guccione"), Mike Krekeler ("Krekeler") and Michael Padella ("Padella")[1], alleges as follows:

1.      This action is brought under 18 U.S.C. §1983 against the City of Cottleville, Missouri, its administrators, mayor, and aldermen who were in office from approximately April 2023 until approximately April 2025.  During that time period, the Defendants illegally prohibited Plaintiff from constructing a multi-family housing development, which

---

[1] For ease of reference, all of the defendants in this action are referenced as a group by use of the term "Defendants."  Defendants Francis, Ronkoski, Gnau, Colombatto, Guccione, Krekeler, and Padella (that is, all Defendants other than the City) are referenced as a group by use of the term "Individual Defendants."  Lastly, Gnau, Colombatto, Guccione, and Krekeler are referenced as a group by use of the term "Alderman Defendants."

had been previously approved by the City in May 2022.  Colombatto and Gnau specifically campaigned for office on the policy of preventing the development.  On May 17, 2023, Francis, Ronkoski, Gnau, Colombatto, Guccione, and Krekeler had a secret closed-door meeting where they all unanimously voted to issue the First Stop Work to Plaintiff on May 19, 2023, under the false pretext that construction had not started on the development within the required time period.  Plaintiff appealed the First Stop Work Order to the City's Board of Adjustment ("BOA"), which upheld the First Stop Work Order, based the grounds listed in the First Stop Work Order and on additional grounds raised for the first time before the BOA.  Plaintiff then appealed the decision of the City's BOA to the Circuit Court for St. Charles County.  The Circuit Court reversed the decision of the City's BOA, found that Plaintiff had started construction within the required time period, and held the First Stop Work Order to be null and void.  A mere six (6) days later, the City issued another stop work order, which ordered Plaintiff cease and desist construction on the project on the same bases already rejected by the Circuit Court (the "Second Stop Work Order").  Additionally, the City appealed the Circuit Court's judgment to the Missouri Court of Appeals.  The Missouri Court of Appeals affirmed the Circuit Court's judgment and the City did not seek review from the Missouri Supreme Court.  Like clockwork, six (6) days after the Court of Appeals issued its opinion, the City sent Plaintiff another letter threatening criminal prosecution if Plaintiff attempted to develop the project (the "Third Stop Work Order").

2.    The actions of the City, its administrators, mayor, and aldermen are truly irrational.  Despite the fact that Defendants were instructed by the Circuit Court that they had no basis to issue the First Stop Work Order, they issued the Second Stop Work Order

on the same basis just days later. And then, after they were instructed by the Court of Appeals that they had no basis to issue the First Stop Work Order, they refused to allow Plaintiff to develop the project and even threatened criminal prosecution. Indeed, Defendants actions are the definition of insanity, that is, doing the same thing over and over again, but expecting different results.

3.      Less than a month after the City issued the Third Stop Work Order, the City held its 2025 municipal election. Ronkoski and Colombatto were booted out of office by the City's voters. Stephen Thompson ("Thompson"), a former alderman of the City, became the new mayor, and in May 2025, he directed the City's counsel to issue a letter to Plaintiff rescinding the stop work orders and allowing Plaintiff to continue development on the Project.

4.      Since that time, Plaintiff has undertaken to develop the project, but has found that market conditions have changed over the three (3) years since the project was originally approved. Construction costs, both labor and materials, have increased drastically. Additionally, Plaintiff has lost its financing for the project and likely cannot obtain financing under current market conditions, based on prudent lending guidelines and practices. Plaintiff has in excess of $1,000,000.00 invested into the Project and has lost profits in excess of $10,000,000.00. Plaintiff brings this suit to hold the City, its administrators, its mayor, and its aldermen accountable for their violations of Plaintiff's constitutional rights. Further, Plaintiff seeks punitive damages against all Defendants, except the City, for their intentional conduct and to dissuade similarly situated individuals in the future. Plaintiff also seeks its attorneys' fees and costs.

4

**The Parties, Jurisdiction and Venue**

5.      Plaintiff Harmony Pointe, LLC is a limited liability company organized and operating under the laws of the State of Missouri.

6.      Defendant City of Cottleville, Missouri (the "City") is a fourth class city and political subdivision of the state of Missouri, located in St. Charles County, Missouri.

7.      Defendant Francis is a natural person who is a resident of St. Charles County, Missouri.  Defendant Francis was the city administrator for City from approximately 2016 until he retired and Defendant Padella was hired as the city administrator.

8.      Defendant Ronkoski is a natural person who is a resident of St. Charles County, Missouri.  Defendant Ronkoski was the mayor of City from the date of his election in 2021 until he was defeated by Thompson in the April 8, 2025, municipal election.

9.      Defendant Gnau is a natural person who is a resident of St. Charles County, Missouri.  Defendant Gnau is a current alderman of ward 2 for the City, a position he has held since he was elected on April 4, 2023.

10.      Defendant Colombatto is a natural person who is a resident of St. Charles County, Missouri.  Defendant Colombatto was an alderman of ward 1 for the City from April 4, 2023, until she was defeated by Elizabeth Holt in the April 8, 2025, municipal election.

11.      Defendant Guccione is a natural person who is a resident of St. Charles County, Missouri.  Defendant Guccione is an alderman of ward 1 for the City, a position he has held since before May 2022.

12.      Defendant Krekeler is a natural person who is a resident of St. Charles

5

County, Missouri. Defendant Krekeler is an alderman of ward 2 for the City, a position he has held since he before May 2022.

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

14. This Court has personal jurisdiction over the City, as the City is political subdivision of Missouri, is organized pursuant to Missouri law, and is located within Missouri.

15. This Court has personal jurisdiction over the Individual Defendants as they are all natural persons domiciled within the state of Missouri.

16. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(1), as all of the Defendants reside within Missouri and all reside within this judicial district.

## Facts Applicable to All Counts

17. Plaintiff is the record owner of certain real property commonly known and numbered as 1503 Highway N, Cottleville, Missouri, 63304 (the "Property").

18. Plaintiff acquired the Property in 2021 for the purpose of constructing a mixed-use development that included an apartment complex on the Property.

### *The City's Approval of the Development*

19. On November 17, 2021, Plaintiff, through its engineer, submitted a conditional use application ("C.U.P. Application") and a planned unit development-area plan application ("Initial Area Plan") to the City, for the construction of a mixed-use development that included a 98-unit apartment complex (the "Development") located at

6

and on the Property.

20.     On August 18, 2021, the City's Board of Aldermen approved Plaintiff's C.U.P. Application and Initial Area Plan.  The City's Old Town Historic District approved the elevations for Plaintiff's Development and issued a Certificate of Appropriateness on April 7, 2022.

21.     On April 13, 2022, Plaintiff submitted its Planned Unit Development-Final Plan Application for the Development to the City (the "Final Plan").

22.     On May 18, 2022, after months of applications, approvals, meetings, negotiations, and hearings, the City approved the Final Plan for the Development through its adoption and passing of Ordinance No. 2008.

23.     A true and accurate copy of Ordinance No. 2008 is attached hereto and incorporated herein as **Exhibit A**.

24.     At the time of the approval of Final Plan, the City's Board of Alderman consisted of Guccione and Krekeler, as well as Thompson and John Stiles ("Stiles).

25.     The Final Plan was approved by a vote of two (2) to two (2), with Guccione and Stiles voting in favor of the Development.  The tie was broken by Ronkoski, who voted in favor of the Development.

26.     Ronkoski voted in favor of the Development because he "would be taking the advice of our two City attorneys who stated most likely they could not successfully defend the City if Bill 22-04 failed at this point which could then result in legal fees, settlements, and possible loss revenue to the applicant that could top $500,000.00."

27.     On June 10, 2022, the City and Plaintiff entered into a Planned Unit

7

Development Agreement, whereby the City agreed to issue building permits and other authorizations needed by Plaintiff in connection with constructing the Development.

28.    A true and accurate copy of the Planned Unit Development Agreement is attached hereto and incorporated herein as **Exhibit B**.

29.    On September 29, 2022, Plaintiff submitted a building permit application to the City.

30.    On November 1, 2022, the City approved Plaintiff's construction plans for the Development.

31.    A true and accurate copy of the final construction plans is attached hereto and incorporated herein as **Exhibit C**.

32.    On November 7, 2022, the City issued the building permit for the Development.

33.    Thereafter, until May 19, 2023, Plaintiff began construction of the Development on the Property.

34.    Specifically, before May 15, 2023, Plaintiff:

a.   Staked the Property for tree clearing:

b.   Staked the building corners;

c.   Prepared the Property for the building pad by hydro-excavating along Highway N;

d.   Worked with Ameren regarding covering overhead electrical lines and proximity of surcharge materials with Ameren's poles;

e.   Performed additional hydro-excavation work in relation to Spire gas

lines;

f.   Cleared the site;

g.   Bored potholes for monitoring soil compaction; and

h.   Fabricated settlement plates which were to be used in the compaction process.

*Individual Defendants' Attempts To Stop the Development*

35.   Unbeknownst to Plaintiff, the City's approval of Plaintiff's Development caused some consternation among a small number of residents in the City.

36.   Colombatto and Gnau, who were not alderman at the time of the City's approval of the Development, were motivated to run for political office, at least in substantial part, by the City's approval of the Development.

37.   Indeed, both Colombatto and Gnau ran for office on the promise that they would stop the Development.

38.   At the election held on April 4, 2023, Gnau defeated Thompson for an alderman seat.

39.   Additionally, Colombatto won a seat on the board of aldermen.

40.   On April 19, 2023, Colombatto took her oath of office and took over Stiles seat on the board of aldermen.

41.   Upon information and belief, Gnau took his oath of office and took over Thompson's seat on the board of aldermen before May 17, 2023.

42.   Thereafter, Colombatto, Gnau, and others began to look for ways to exercise City power, even if it needed to be done illegally and/or irrationally, to stop the

Development, even though it was already under construction.

43.    On May 17, 2023, the Aldermen Defendants held a secret, closed meeting, with Francis and Ronkoski, and potentially others, where they voted to instruct Francis and Ronkoski to issue a stop work order to Plaintiff, ordering Plaintiff to stop work on the Development.

44.    As a false pretext for the stop work order, the Alderman Defendants looked to Section 405.390.C of the City's Municipal Code, which provides that approval of a P.U.D. final plan expires one (1) year after the date of approval unless construction is begun.

45.    Even though Plaintiff had begun construction on the Development and the deadline for Plaintiff to begin construction did not expire until May 18, 2023, the Aldermen Defendants unanimously voted take enforcement action specifically against Plaintiff on May 17, 2023, and to instruct Francis and Ronkoski to issue a stop work order to Plaintiff.

46.    The Aldermen Defendants had no rational basis to take enforcement action against Plaintiff, as Plaintiff had undeniably started construction on the Development and the time period in which Plaintiff had to start construction had not yet expired.

47.    Nevertheless, on May 19, 2023, the City, through Francis and Ronkoski, issued a stop work order to Plaintiff to halt all construction on the Property (hereinafter the "First Stop Work Order"). A true and accurate copy of the First Stop Work Order is attached hereto and incorporated herein as **Exhibit D**.

48.    Plaintiff timely appealed the issuance of the First Stop Work Order to the City's Board of Adjustment.

49.     On July 20, 2023, a hearing was held before the City's Board of Adjustment, whereat evidence was adduced, testimony was heard, and arguments were made regarding the legality of the First Stop Work Order.

50.     On July 21, 2023, at approximately 12:08 a.m., the BOA refused to rescind the First Stop Work Order and adopted wholesale the City's proposed findings of fact and conclusions of law as its written decision (the "Written Decision").   A true and accurate copy of the Written Decision is attached hereto and incorporated herein as **Exhibit E**.

51.     As part of its Written Decision, the BOA adopted the bases set forth in the First Stop Work Order.

52.     Additionally, in its Written Decision, the BOA determined that the First Stop Work Order was also legally valid because:

a.  Plaintiff's C.U.P. had expired pursuant to Section 400.130(G)(1) of the City's Zoning Code, because Plaintiff was required to obtain a building permit and being the erection or alteration of the Property on or before June 13, 2022, but Plaintiff had not obtained a building permit until November 7, 2022 [Exhibit D at Paragraphs JJ through MM]; and

b.  Plaintiff's Certificate of Appropriateness expired pursuant to Section 405.135(C) of the City's Zoning Code, because Plaintiff was required to commence construction by October 7, 2022, but Plaintiff had not obtained a building permit until November 7, 2022 [Exhibit D at Paragraphs PP through RR].

*The Harmony Pointe I Litigation and Judgment*

11

53.     On August 18, 2023, Plaintiff timely filed Petition for Writ of Certiorari in the Circuit Court of St. Charles County, Cause No. 2311-CC00860 (hereinafter, referred to as "*Harmony Pointe I*") challenging the BOA's Written Decision.

54.     On April 17, 2024, the Trial Court in *Harmony Pointe I* issued a judgment (hereinafter the "*Harmony Pointe I* Judgment"), wherein the Trial Court declared the City's First Stop Work Order to be "null and void" and reversed the BOA's Written Decision.

55.     A true and accurate copy of the *Harmony Pointe I* Judgment is attached hereto and incorporated herein as **Exhibit F**.

56.     Undeterred, on April 23, 2024 – a mere six (6) days after the entry of the *Harmony Pointe I* Judgment – the City turned around and issued yet another stop work order (hereinafter the "Second Stop Work Order") prohibiting Plaintiff from engaging in any construction on the already approved Development.

57.     A true and accurate copy of the Second Stop Work Order is attached hereto and incorporated herein as **Exhibit G**.

58.     Upon information and belief, the Second Stop Work Order was approved at a secret meeting by the Aldermen Defendants, who specifically instructed Padella to issue the Second Stop Work Order to Plaintiff.

59.     The City's stated basis given for issuing the Second Stop Work Order was that Plaintiff's Conditional Use Permit and Certificate of Appropriateness had expired.

60.     Specifically, the City claimed that Plaintiff's C.U.P. had expired pursuant to Section 400.130(G)(1) of the City's Zoning Code, because Plaintiff was required to obtain

a building permit and being the erection or alteration of the Property on or before June 13, 2022, but Plaintiff had not obtained a building permit until November 7, 2022.

61.     This first "new" basis for supporting the Second Stop Work Order was included in the BOA's Written Decision in Paragraphs JJ through MM, despite the fact that it was not included in the First Stop Work Order.

62.     Second, in the Second Stop Work Order, the City claimed that Plaintiff's Certificate of Appropriateness expired pursuant to Section 405.135(C) of the City's Zoning Code, because Plaintiff was required to commence construction by October 7, 2022, but Plaintiff had not obtained a building permit until November 7, 2022.

63.     This second "new" basis for support the Second Stop Work Order was included in the BOA's Written Decision in Paragraphs PP through RR of the BOA's Written Decision, despite the fact that it was not included in the First Stop Work Order.

64.     The City specifically argued both of these new points (expiration of the CUP and Certificate of Appropriateness) to the Trial Court in Section IV, pp. 12 – 14 of its Brief in Support of Affirming the Board of Adjustment's Decision.

65.     A true and accurate copy of the City's Brief in Support of Affirming the Board of Adjustment's Decision is attached hereto and incorporated herein as **Exhibit H**.

66.     Both of these new bases offered to support the Second Stop Work Order were rejected by the Trial Court.

67.     Defendants were well aware of the *Harmony Pointe I* Judgment at the time they issued the Second Stop Work Order and had full knowledge that the pretextual

justifications contained therein had been flatly rejected and overruled by way of the *Harmony Pointe I* Judgment.

68.    Indeed, the Second Stop Work Order appears to have been issued in direct response to the Judgment.

69.    Despite this knowledge, the City issued Second Stop Work Order anyway as part of a deliberate scheme to ignore the Courts, ignore the law and do whatever necessary to stop the already-approved Development from going forward.

<u>*The City's Appeal*</u>

70.    On April 26, 2023, three (3) days after issuing the Second Stop Work Order, the City filed a notice of appeal of the Judgment.

71.    On June 28, 2024, counsel for Plaintiff wrote to the City and pointed out that the Second Stop Work Order was brazenly illegal because "both grounds mentioned in [the Second Stop Work Order] were raised by the City and rejected by the Court[.]" (hereinafter, the "6-28-24 Letter").

72.    A true and accurate copy of the 6-28-24 Letter is attached hereto and incorporated herein as **<u>Exhibit I</u>**.

73.    On July 26, 2024, counsel for the City wrote back (hereinafter the "7-26-24 Letter") and stated that Plaintiff was "currently prohibited from working on the Project site" because the City's appeal of the Judgment operated as an automatic stay of execution of the Judgment.

74.    A true and accurate copy of the 7-26-24 Letter is attached hereto and incorporated herein as **<u>Exhibit J</u>**.

75.     Additionally, and brazenly, the City stated that the two issues raised in the Second Stop Work Order were not resolved by the BOA's Written Decision or by the Judgment, despite the fact that it was the City who argued to the BOA that expiration of the CUP and the Certificate of Appropriateness were proper bases to support the First Stop Work Order, who prepared proposed findings of fact and conclusions of law (which were wholesale adopted by the BOA) on both of those bases to support the First Stop Work Order, and who argued to the Trial Court (in writing!) that both of those bases supported the First Stop Work Order.

76.     The City concluded its ominous 7-26-24 Letter by threatening to criminally prosecute Plaintiff if it refused to comply with the patently illegal Second Stop Work Order.

77.     The City's appeal of the *Harmony Pointe I* Judgment proceeded throughout 2024.

78.     The City, after interjecting these issues raised in the Second Stop Work Order into the BOA hearing and before the Trial Court, attempted to walk back those issues in its appeal, presumably so it could attempt to force Plaintiff to relitigate those issues. *See* fn. 11, Ex. K.

79.     A true and accurate copy of the City's Respondent's Brief is attached hereto and incorporated herein as **Exhibit K**.

80.     The City lost.  On March 11, 2025, the Missouri Court of Appeals for the Eastern District issued an opinion concluding: "the trial court's judgment reversing the Board of Adjustment's decision is affirmed."

15

81.    A true and accurate copy of the *Harmony Pointe I* Opinion is attached hereto and incorporated herein as **Exhibit L**.

82.    After the time for seeking further relief from the Missouri Supreme Court expired, the Court of Appeals issued a mandate on April 17, 2025.

### The City's Continued Disregard for the *Harmony Pointe I* Judgment and Attempts to Further Halt Construction

83.    Refusing to accept the emphatic court rulings in *Harmony Pointe I*, however, the City persisted in its attempt to halt the approved Development by whatever means possible.

84.    To that end, a mere six (6) days after the Court of Appeals opinion was issued in *Harmony Pointe I*, the City wrote to Plaintiff (hereinafter the "Third Stop Work Order") that the Second Stop Work Order – which was based on the same exact grounds set forth in the 7-20-23 BOA Findings that had been reversed by the *Harmony Pointe I* Judgment – was in effect and prohibited Plaintiff from engaging in any further construction on the Development.

85.    A true and accurate copy of the Third Stop Work Order is attached hereto and incorporated herein as **Exhibit M**.

86.    Once again, in the Third Stop Work Order the City threatened to criminally prosecute Plaintiff unless it went along with the City's preposterous notion that the Trial Court and Court of Appeals squarely rejected in *Harmony Pointe I*.

87.    The City sent the Third Stop Work Order in deliberate disregard for the *Harmony Pointe I* Judgment and appellate court ruling.

16

88.     The Second Stop Work Order and Third Stop Work Order recites the very same "deficiencies" and "expirations" that formed the basis of the BOA's Written Decision.

89.     The *Harmony Pointe I* Judgment overturned the BOA's Written Decision. The City is collaterally estopped from raising any of the matters set forth therein.

### The City Finally Capitulates

90.     On April 8, 2025, the City held its municipal election.

91.     At the election, Colombatto was defeated by Elizabeth Holt.

92.     At the election, Ronkoski was defeated by Thompson.

93.     Upon information and belief, the results of the election caused the City change course regarding the development.

94.     On April 30, 2025, the City capitulated, by sending Plaintiff a letter where in the City "decided to rescind the Stop Work Order issued on April 23, 2024, effective immediately."

95.     A true and accurate copy of the 4-30-205 Letter is attached hereto and incorporated herein as **Exhibit N**.

96.     Even in defeat, the City still tried to maintain the abject fiction that it still somehow had the right to prevent Plaintiff from constructing the previously-approved Development.

97.     Thereafter, Plaintiff set out to secure bids from contractors to construct the Development.

98.     Unfortunately, the costs to construct the Development had increased dramatically, in some cases by triple the original cost.

99.     Given the current market conditions, Plaintiff cannot construction the Development for a profit and no reasonable developer would attempt to construct the Development, despite the costs already incurred in construction.

100.    As a result of the current economics for the Development, Plaintiff cannot secure financing for the Development.

101.    Plaintiff has incurred in excess of $1,000,000.00 in costs related to the Development, including the costs of plans, approval, and construction expenses.

102.    Plaintiff has lost profits that it would have reasonably received from the Development, after all development and operating expenses, in excess of $10,000,000.00.

103.    Defendants truly irrational refusal to comply with the ruling from the Circuit Court and the Court of Appeals has infringed on Plaintiff's constitutional rights and injured Plaintiff by denying Plaintiff the right to construct the Development, which the City previously approved.

## COUNT I: DENIAL OF SUBSTANTIVE DUE PROCESS IN VIOLATION OF 42 U.S.C. §1983

104.    Plaintiff re-states and re-alleges the allegations set forth in Paragraphs 1-103 as if full set forth herein.

105.    The City's actions are a deliberate attempt to subvert the rule of law and strip Plaintiff of its property rights in connection with constructing the Development in accordance with the City's prior approvals.

106.    Indeed, the City previously granted Plaintiff the right to construct the Development.  Specifically:

a.  On May 18, 2022, the City enacted Ordinance No. 2008 approving Plaintiff's Final Plan for the Development;

b.  On June 10, 2022, the City and Plaintiff entered into a Planned Unit Development Agreement whereby the City agreed to issue building permits and other authorizations needed by Plaintiff in connection with constructing the Development; and

c.  On November 1, 2022, the City approved the Plaintiff's construction plans for the Development.

107.  After the election of new leaders who promised to halt the Development by any means (legal or otherwise), the City did exactly that and issued the Second Stop Work Order mere days after the *Harmony Pointe I* Judgment for grounds that were expressly overturned therein.

108.  At the time it sent the Second Stop Work Order, the City knew that the grounds set forth therein were among the 7-20-23 BOA Findings expressly overturned by the *Harmony Pointe I* Judgment.

109.  At the time it sent the Second Stop Work Order, the City knew that it collaterally estopped from re-litigating any of the issues contained in the Written Decision and/or the Judgment.

110.  The City sent the Second Stop Work Order anyway to strip Plaintiff of its property rights without compensation.

111.  Mere days after the Court of Appeals held that the Trial Court in *Harmony Pointe I* was correct in reversing the Written Decision, the City sent the Third Stop Work

Order and claimed that work must be halted for the exact same reasons set forth in the now-twice-reversed Written Decision.

112. The *Harmony Pointe I* Judgment collaterally estopped the City from attempting to halt work based on any of the grounds identified in the twice-reversed Written Decision.

113. At the time of the Third Stop Work Order, the City had full knowledge that it was collaterally estopped from re-litigating any of the grounds identified in the twice-reversed Written Decision.

114. The City issued the Third Stop Work Order anyway out of animus and for the deliberate purpose of stripping Plaintiff of its property rights without compensation.

115. Plaintiff had a constitutionally protected property interest in the Final Plan for the Development approved by the City and in the City's compliance with the Development Agreement.

116. The City's issuance of the Second Stop Work Order and threat to criminally prosecute Plaintiff if it proceeds with construction as authorized was truly irrational and more than just arbitrary, capricious or in violation of state law.

117. The City's issuance of the Second Stop Work Order and threat to criminally prosecute Plaintiff if it proceeds with construction was done with full knowledge that doing so was illegal and was done for the deliberate purpose of striping Plaintiff of its constitutionally protected property rights.

118.    The City's issuance of the Second Stop Work Order and repeated threats to criminally prosecute Plaintiff for proceeding with construction of the approved Development has proximately caused damages to Plaintiff in the form of:

      a.  Over $1,000,000.00 in cost incurred by Plaintiff in constructing the Development, which are now useless and of no economic value to Plaintiff; and

      b.  Over $10,000,000.00 in lost profits from the Development, which Plaintiff would have reasonably received but for the Defendants' illegal actions.

119.    Plaintiff is also entitled to its reasonable attorney's fees incurred in connection with bringing this action under 42 U.S.C. §1988.

120.    The Individual Defendants have displayed a deliberate indifference and intentional disregard for Plaintiff's property rights and right to due process.

121.    Accordingly, Plaintiff seeks punitive damages against the Individual Defendants, in order to punish their intentional conduct and to dissuade similarly situated individuals in the future.

WHEREFORE Plaintiff Harmony Pointe, LLC, respectfully requests judgment be entered in its favor on Count I and for an award for damages in excess of $25,000 as well as pre and post-judgment interest at the maximum rate available under law and for its reasonable attorneys' fees and costs, and any additional further relief deemed fair and just.

## COUNT II: TAKING OF PROPERTY WITHOUT JUST COMPENSATION IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES AND CONSTITUTION OF THE STATE OF MISSOURI

122.    Plaintiff re-states and re-alleges the allegations set forth in Paragraphs 1-121 as if full set forth herein.

123.    The Defendants' issuance of the Second Stop Work Order and threat to criminally prosecute Plaintiff if it proceeds with construction of the Development is a taking of Plaintiff's property rights under Article 1, Sections 10, 26 and 28 of the Constitution of the State of Missouri.

124.    The Defendants' issuance of the Third Stop Work Order and threat to criminally prosecute Plaintiff if it proceeds with construction of the Development is a taking of Plaintiff's property rights under Article 1, Sections 10, 26 and 28 of the Constitution of the State of Missouri.

125.    The Defendants' issuance of the Second Stop Work Order and threat to criminally prosecute Plaintiff if it proceeds with construction of the Development is a *per se* physical taking in violation of the Fifth and Fourteenth Amendment of the United States Constitution because it appropriates Plaintiff's right to enter its own property and perform approved construction of the Development.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 155 (2021).

126.    As a result of the Defendants' aforementioned taking, Plaintiff has sustained damages in excess of $10,000,000.00.

127.    Plaintiff is entitled to its reasonable attorney's fees incurred in connection with bringing this action under 42 U.S.C. §1988.

22

128.    The Individual Defendants have displayed a deliberate indifference and intentional disregard for Plaintiff's property rights.

129.    Accordingly, Plaintiff seeks punitive damages against all Individual Defendants, in order to punish their intentional conduct and to dissuade similarly situated individuals in the future.

WHEREFORE Plaintiff Harmony Pointe, LLC, respectfully requests judgment be entered in its favor on Count II and for an award for damages in excess of $25,000 as well as pre and post-judgment interest at the maximum rate available under law and for its reasonable attorneys' fees, and any additional further relief deemed fair and just.

Respectfully submitted,

**CAPES,        SOKOL,        GOODMAN        &
SARACHAN, P.C.**

By:  */s/ Zachary R. McMichael*
Zachary R. McMichael, #68251MO
8182 Maryland Ave., 15th Floor
St. Louis, MO 63105
(314) 505-5464 (telephone)
(314) 505-5465 (facsimile)
mcmichael@capessokol.com

*Attorneys for Plaintiff Harmony Pointe, LLC*