IN THE CIRCUIT COURT OF ST. CHARLES COUNTY
STATE OF MISSOURI

| | |
|---|---|
| HARMONY POINTE, LLC, | ) |
| Petitioner, | ) Case No. 2311-CC00860 |
| | ) |
| | ) Div.: 5 |
| v. | ) |
| | ) |
| CITY OF COTTLEVILLE, MO, et al. | ) |
| | ) |
| Respondents. | ) |

### RESPONDENTS' BRIEF IN SUPPORT OF AFFIRMING THE BOARD OF ADJUSTMENT'S DECISION

Respondents, City of Cottleville, Missouri, Michael Louis, Nathan Tormala, Tom Longinette, and Jonathan Layfield in their capacities as Members of the Board of Adjustment for the City of Cottleville (collectively "Respondents") submit their Memorandum in Support of Respondents' decision.

### INTRODUCTION

In this case, the Petitioner, Harmony Pointe, LLC, seeks juridical review of a decision by the City's Board of Adjustment upholding a Stop Work Order issued to Petitioner in connection with a proposed apartment complex development to be constructed on property commonly known and numbered as 1503 Highway N (the "Property"), within the City. Petitioner's Final Plan for the development was approved on May 18, 2022, pursuant to Ordinance 2008.[1] The Stop Work Order was issued by the City Administrator and Mayor on May 19, 2023, as a result of Petitioner's failure to begin construction of the apartment development within one-year of receiving approval of its Final Plan, as required by the City's P.U.D. Ordinance, § 405.390(C).[2] The City issued the Stop Work Order pursuant to P.U.D. Ordinance, § 405.400, which

---

[1] Segment ("Seg.") 15-16; BOA Record 300-310; Appendix D: Relevant ordinances excluding exhibits referenced therein
[2] Appendix B



authorizes the City to issue a stop work order in connection with any Planned Unit Development Project as follows:

> "[a]ny violation of either the approved area plan or approved final plan shall be grounds for the Code Enforcement Officer to issue a stop-work order and to withhold building permits, occupancy permits or certificates of zoning compliance until the violation is removed, or the area plan and/or final plan is otherwise complied with, and shall cause the owner of the development, or any portion thereof, to be subject to the provision of this [Chapter 405, Article V]."

As will be discussed in more detail below, between May 18, 2022, and May 18, 2023, Petitioner began allowing the Property to be used for patrons visiting Frankie Martin's Garden, a food truck park located adjacent to the Property. Moreover, during that timeframe the only work completed by Petitioner on the Property involved tree clearing, boring potholes to monitor sole compaction, hydro excavation to locate utilities, the erection of a job board and the staking of building corners. However, none of this activity qualifies as "construction" under its plain and ordinary meaning—the Property remains an empty lot with no foundations poured or any structure erected.

Thus, the City's decision to issue the Stop Work Order was authorized under the City Code, and there is substantial evidence supporting the Board of Adjustment's decision to uphold issuance of the Stop Work Order. The Board of Adjustment's decision should therefore be affirmed.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

On June 14, 2021, the City received a Conditional Use Application (the "First C.U.P. Application"), submitted by Cliff Heitmann, a civil engineer at Bax Engineering Co., on behalf of Joseph Shatro, the previous owner of Property seeking to develop the Property.[3] The City also received a Planned Unit Development-Area Plan Application submitted by Progress Property

---

[3] Seg. 14; BOA Record 253 – 255

2

Group, which is a related development entity to Petitioner.[4] The plans submitted with the First C.U.P. Application involved a mixed-use project, consisting of multiple-family apartments and commercial uses (the "Project").[5] On August 18, 2021, the City's Board of Alderman approved these applications pursuant to Ordinances Nos. 1951[6] and 1952.[7] The City's Old Town Historic District approved the Project's initial elevations and issued the first Certificate of Appropriateness for the Project on October 4, 2021.[8]

Cliff Heitmann, then on behalf of Petitioner, submitted a second Conditional Use Application (the "Second C.U.P. Application") and a second Planned Unit Development-Area Plan Application ("Amended Area Plan"), for the same proposed use as the First C.U.P. Application, on November 17, 2021.[9] The City's Board of Alderman approved the Second C.U.P. Application and the Amended Area Plan on December 15, 2021 pursuant to Ordinance Nos. 1979[10] and 1980.[11] The City's Old Town Historic District again approved amended elevations for the Project and issued a Second Certificate of Appropriateness on April 7, 2022.[12]

On April 13, 2022, the City received a Planned Unit Development-Final Plan Application for the Project.[13] The City's Board of Alderman approved the Final Plan for the Project ("Final Plan") pursuant to Ordinance No. 2008 on May 18, 2022.[14] Petitioner was required to begin

---

[4] Seg. 3; BOA Record 88 – 90
[5] Seg 14; BOA Record 253 – 256
[6] Seg. 3; BOA Record 92 – 106; Appendix D
[7] Seg. 3; BOA Record 107 – 112 to Seg. 4; BOA Record 113-118; Appendix D
[8] Seg. 4; BOA Record 119-121
[9] Seg. 14; BOA Record 260-266
[10] Seg. 14; BOA Record 267-270; Appendix D
[11] Seg. 5 BOA Record 148-157; Appendix D
[12] Seg. 15; BOA Record 296-298
[13] Seg. 48; BOA Record 1221-1223
[14] Seg. 15-16; BOA Record 300-310; Appendix D

3

Electronically Filed - ST CHARLES CIRCUIT DIV - December 01, 2023 - 05:38 PM

construction within one year of this Final Plan approval pursuant to the City's P.U.D. Ordinance, § 405.390(C), which states:[15]

> "[a]pproval of the final plan of a PUD shall expire and be of no effect one hundred eighty (180) days after the date of approval unless and until all appropriate fees have been paid and the City shall have issued a building permit for the development authorized by said approved plan. Approval of the final plan in a PUD shall expire and be of no effect one (1) year after the date of approval unless construction is begun and is diligently pursued in accordance with the approved plan. Expiration of the approved plan shall authorize the Board to require filing and review of a new final plan in accordance with the provision of this [Chapter 405, Article V]."

Following the Final Plan approval, Petitioner obtained additional permits and approvals required under the City's Municipal Code. For example, Petitioner submitted its Flood Plain Application on July 22, 2022, which was approved on July 29, 2022.[16] Petitioner submitted Construction Plans to the City that were approved on November 1, 2022.[17] Finally, Petitioner submitted a Building Permit Application on September 29, 2022, and the City issued the Building Permit for the Project on November 7, 2022.[18] However, Petitioner did not begin construction on the property in accordance with the City's P.U.D. Ordinance as evidenced by photos of the property, taken on May 18, 2023, showing no building or structure on the property.[19]

On May 19, 2023, one year and one day after the date of the Final Plan approval, the City Administrator and Mayor issued a Stop Work Order pursuant to P.U.D. Ordinance, § 405.400.[20]

---

[15] Appendix B
[16] Seg. 15; BOA Record 299
[17] Seg. 16; BOA Record 312-313
[18] Seg. 16; BOA Record 314-315
[19] Seg. 16; BOA Record 316 – 321; Appendix C
[20] Seg. 16; BOA Record 322-323; Appendix D

4

At that time, Petitioner's Second Conditional Use Permit, Second Certificate of Appropriateness, and Building Permit had also all expired.[21]

Petitioner filed an appeal of the Stop Work Order to the City's Board of Adjustment and requested that the Board reverse the issuance of the Stop Work Order. The Board held a hearing on the record on July 20, 2023, and subsequently issued its Findings of Fact and Conclusions of Law upholding the City's decision to issue the Stop Work Order[22]

## STANDARD OF REVIEW

"The scope of judicial review of a board of adjustment decision is limited to determining whether the decision was authorized by law and supported by competent and substantial evidence upon the ***whole record***." *Campbell v. City of Columbia*, 824 S.W.2d 47, 49 (Mo. App. W.D. 1991) (citing *Huff v. Board of Adjustment of City of Independence*, 695 S.W.2d 166, 167 (Mo. App. W.D. 1985)(emphasis added). "The purpose of the writ is to test the legality of the board's order. The order of the board cannot be set aside solely because the court considers the evidence in a different light unless the action of the board is clearly contrary to the overwhelming weight of the evidence." *Cunningham v. Leimkuehler*, 276 S.W.2d 633, 636 (Mo. App. E.D. 1955).

"The Court determines de novo whether a decision is authorized by law as it is a legal question." *Emerald Pointe, LLC v. Taney County Planning Commission*, 621 S.W.3d 188, 192 (Mo. App. S.D. 2021). However, "[a] reviewing court cannot substitute its judgment for that of the Zoning Board of Adjustment." *Id.* (citing *Lorenz v. City of Florissant*, 787 S.W.2d 776, 777 (Mo. App. E.D. 1988)). "In reviewing for substantial evidence to support the decision of the [board], the ***evidence is viewed in the light most favorable to the board***, giving it the benefit of all

---

[21] The Transcript can be found at Seg. 33; BOA Record 718-973. In addition, the City filed the transcript on November 14, 2023. Going forward, the transcript will be cited as <u>Transcript 201:9-205:24</u>; *see also* Appendix A
[22] BOA Transcript 6:3-5

5

reasonable inferences." *Id.* (emphasis added). "If the result reached could reasonably have been reached, a reviewing court is without authority to disturb the finding unless it was clearly contrary to the overwhelming weight of evidence." *Id.*

## ARGUMENT

I. <u>The Rules of Statutory Interpretation Require the Plain and Ordinary Meaning of the Word "Construction" to be Used in Interpreting the City's P.U.D Ordinance</u>

The City of Cottleville's Municipal Code Chapter 405, Article V, titled Planned Unit Developments and Multiple-Family Planned Unit Developments ("P.U.D. Ordinance") governs the procedure, standards and violations of P.U.D. projects. P.U.D. Ordinances, §§ 405.325 to 405.405, are the relevant ordinances applicable to Petitioner's Project.[23]

P.U.D. Ordinance § 405.390(C) provides that the approval of a final plan shall expire after one (1) year unless construction is started and diligently pursued in accordance with the approved Final Plan within that timeframe.  Specifically, P.U.D. Ordinance § 405.390(C) states, "Approval of the final plan in a PUD shall expire and be of no effect one (1) year after the date of approval unless construction is begun and is diligently pursued in accordance with the approved plan." The P.U.D. Ordinance does not specifically define the term "construction," and the determination of whether Petitioner began "construction" on the Property in accordance with the Final Plan as required by the P.U.D. Ordinance is the primary issue in this case.

"In reviewing city ordinances, [the court] appl[ies] the same general rules of construction as are applicable to state statutes." *Emerald Pointe, LLC v. Taney County Planning Commission*, 621 S.W.3d 188, 192 (Mo. App. S.D. 2021). "The general rule is to determine and give effect to the enacting legislative body's intent of the ordinance." *Id.* "In an ordinance, the words

---

[23] Appendix B

contained therein should be given their *plain and ordinary meaning*." *Id.* (emphasis added). In that regard, "the word's dictionary definition supplies its plain and ordinary meaning." *Hoffman v. Van Pak Corp.*, 16 S.W.3d 684, 688 (Mo. App. E.D. 2000).

Black's Law Dictionary defines "construction," in pertinent part, as "[t]he *act of building* by combining or arranging parts of elements; the thing so built." *Construction*, Black's Law Dictionary (11th ed. 2019) (emphasis added). Merriam-Webster's dictionary defines, "construct" as "to make or form by combining or arranging parts or elements: *build*." *Construct*, Merriam-Webster (10th Ed. 1993) (emphasis added). These definitions are substantially the same. Common to both definitions are the concepts of "combining and arranging parts" and "building."

Merriam-Webster's Dictionary defines the verb "building," as "the art or business of assembling materials *into a structure*." *Building*, Merriam-Webster (10th Ed. 1993) (emphasis added). Merriam-Webster's Dictionary defines the verb "build" as "to form by ordering and uniting materials by gradual means *into a composite whole*." *Build*, Merriam-Webster (10th Ed. 1993) (emphasis added). Common between these two definitions is that materials will be transformed into a structure or common whole.

These definitions were adopted by the Board of Adjustment in the signed Findings of Fact and Conclusions of Law at the conclusion of the hearing on July 20, 2023.[24] Based on the above definitions, the Board of Adjustment could have only found that construction had begun if the tasks completed on the Property involved the combining or arranging of parts or elements into a structure or composite whole. As evidenced by photographs taken on May 18, 2023, one

---

[24] Seg. 33; BOA Record 711-717; Appendix A

day prior to the issuance of the Stop Work Order, it is clear that no structure or composite whole was constructed on the Property.[25]

Therefore, as the Board of Adjustment correctly concluded, and in light of the definitions above, "construction" on the Property has only begun if Petitioner combined or arranged parts or elements into a structure or composite whole. For the reasons discussed below, Petitioner failed to start construction on the Property within one year of approval of the Final Plan.

II. <u>Petitioner Did Not Begin Construction on the Property within One Year as is Required by the City's P.U.D. Ordinance.</u>

Petitioner received approval of its Final Plan on May 18, 2022, pursuant to Ordinance 2008.[26] Pursuant to the P.U.D. Ordinance § 405.390(C), Petitioner was required to begin combining or arranging parts, or elements, into a structure or composite whole by May 18, 2023, one year after the approval of the Final Plan.

From the time Petitioner received approval of the Final Plan on May 18, 2022, to May 18, 2023, Petitioner in fact did not begin construction and therefore, the Final Plan expired. Rather than beginning construction, Petitioner allowed the Property to be used as a parking lot for Frankie Martin's Garden, a food truck park located adjacent to the Property, with no specified dates or times prohibiting people from parking on the Property to allow construction to commence.[27] At all relevant times, the Property remained mainly dirt and gravel.[28]

At the Board of Adjustment hearing, Petitioner called Allen Minks to testify. His role in the Project was to explore the soil beneath the Property and develop recommendations on how

---

[25] Appendix C; the sole structure in the photographs is not part of the Project nor is it located on the Property.
[26] Seg. 48; BOA Record 1225-1227; Appendix D
[27] Transcript 93:12 – 96:10
[28] Transcript 94:6-10; Seg. 16; BOA Record 316-321; Appendix C

8

Electronically Filed - ST CHARLES CIRCUIT DIV - December 01, 2023 - 05:38 PM

to design the structure.[29] Mr. Minks prepared geotechnical reports regarding the Property.[30] In order to prepare these reports, Mr. Minks had to bore holes into the ground in several locations.[31] However, neither Mr. Minks nor his firm constructed anything on the Property. Merely investigating the soil and conditions of the ground and does not involve the combining or arranging of parts or elements into a structure at the Property.

Cliff Heitmann, a civil engineer and owner of Bax Engineering, also testified during the hearing before the Board.[32] Mr. Heitmann's role in the Project was to submit the construction application and construction plans to the City, which he did on July 22, 2022.[33] After submittal, the City reviews and provides comments on the plans.[34] Mr. Heitmann worked with the City and other entities to finalize the construction plans, which were completed in November 2022.[35] Mr. Heitmann acknowledged that his role in the Project was to complete plans so that the contractor could begin construction on the Project.[36] Developing construction plans in anticipation of performing future construction is not synonymous with the actual act of construction.

The evidence is that the only work completed from November 2022 to May 2023 included tree clearing, boring potholes to monitor sole compaction, hydro excavation to locate utilities, the erection of a job board and the staking of building corners.[37] The general contractor for the Project was Nicholas Hugeback.[38] Mr. Hugeback recorded progress reports detailing any

---

[29] Transcript 105:9-14
[30] Transcript 106:11-15
[31] Transcript 110:3-19
[32] Transcript 121:17-25
[33] Transcript 131:1-13
[34] Transcript 132:4-12
[35] Transcript 133:6-23, 135:16-19
[36] Transcript 143:2-4
[37] Seg. 25; BOA Record 433-472
[38] Transcript 159:4-5

work done on the Property.[39] These progress reports showed tree clearing in March 2023.[40] Further, the progress reports showed hydro excavation and instructions sent to a subcontractor to fabricate settlement plates for the ground in May 2023.[41] The only other activities performed on the Property for the month of May 2023 involved setup of a job board and the staking of the building's corners.[42] None of these activities meet the plain and ordinary meaning of construction as required by the P.U.D. Ordinance § 405.390(C). The Stop Work Order was issued on May 19, 2023, due to Petitioner's failure to begin construction in compliance with the P.U.D. Ordinance § 405.390(C).[43]

Simply put, there is substantial evidence to support the Board of Adjustment's finding that Petitioner did not begin construction within one year of the approval of the Final Plan. Rather than beginning construction, Petitioner allowed the Property to be used as a parking lot with no definite time for that use to end, and did not engage in *any* activity, such as pouring a foundation or raising walls, that could qualify as engaging in construction under the plain and ordinary meaning of that word. Therefore, the Final Plan expired pursuant to P.U.D. Ordinance § 405.390(C), becoming of no effect, and the City properly issued a Stop Work Order.

### III. Issuance of the Stop Work Order Was Authorized Under the Code

As part of its appeal to the Board of Adjustment, Petitioner challenged the City's authority to issue the Stop Work Order. However, as the Board correctly found, the City's authority to issue the Stop Work Order arises from P.U.D. Ordinance 405.400. Specifically, P.U.D. Ordinance 405.400 authorizes the City to issue a stop work order in connection with any Planned Unit Development project and states in relevant part: "[a]ny violation of either the

---

[39] Transcript 164:7-23 (Progress Reports located at Seg. 25; BOA Record 433-472)
[40] Transcript 169:21-23; Seg. 25; BOA Record 457 – 459
[41] Transcript 165:2-13; Seg. 25; BOA Record 433-448
[42] Seg. 25; BOA Record 449-456
[43] Seg. 16; BOA Record 322-323

10

Electronically Filed - ST CHARLES CIRCUIT DIV - December 01, 2023 - 05:38 PM

approved area plan or approved final plan shall be grounds for the Code Enforcement Officer to issue a stop-work order . . ."[44]

As discussed above, P.U.D. Ordinance § 405.390(C) provides, in pertinent part, that a Final Plan "shall expire *and be of no effect* one (1) year after the date of approval unless construction is begun and diligently pursued in accordance with the approved plan."[45] Because construction did not begin between May 18, 2022 and May 18, 2023, as discussed above, Petitioner's Final Plan has expired and is of no effect. Thus, beginning construction at any time after May 18, 2023, would have been illegal and resulted in a violation of the Final Plan and P.U.D. Ordinance. The City was therefore authorized to issue the Stop Work Order pursuant to P.U.D. Ordinance 405.400 to prevent Petitioner from beginning illegal construction of the Project after expiration of the Final Plan.

As part of its briefing to the Board of Adjustment, Petitioner asserted that City Code § 500.040(A)(14) is the sole source of authority permitting the City to issue a stop work order, and that the City did not comply with the requirements of that Code section. Under City Code § 500.040(A)(14), a stop work order must: (1) state the reason(s) for the order, and (2) state the conditions under which work may resume.[46] Petitioner's assertion and reliance on City Code § 500.040(A)(14) is incorrect for a number of reasons.

First, City Code § 500.040(A)(14) applies only to a stop work order issued in response to violations of Building Code or building permits. It does not govern stop work orders issued in connection with a Planned Unit Development Project, as is the case with respect to the Stop Work Order at issue here.

---

[44] Appendix B
[45] Appendix B
[46] Appendix B

11

Second, for the reasons discussed above, P.U.D. Ordinance § 405.400 *expressly authorizes* the City to issue a stop work order if there has been a violation of either an approved area plan or final plan.

Finally, even if City Code § 500.040(A)(14) did apply in this case (which it does not), the Stop Work Order issued to Petitioner complied with that Section in that the Stop Work Order stated the reason the Order was issued (i.e., that construction had not begun within one year of the Final Plan approval), and stated the conditions under which work may begin (i.e., "until the violation is removed, or the area plan and/or final plan is otherwise complied with.").[47]

Thus, City's issuance of the Stop Work Order to Petitioner was valid under P.U.D. Ordinance § 405.400 (the controlling authority) and would still be valid under City Code § 500.040(A)(14), if it applied. The Board of Adjustment's decision should be affirmed.

IV.  **Additional Permit Expirations**

In addition to the substantial evidence supporting a finding that Petitioner's Final Plan expired on May 18, 2023, there was also substantial evidence presented to the Board of Adjustment that other permits associated with the Project expired as well.

Developments of commercial and multiple family dwellings in the City's Old Town Historic District, which is where the Property is located, are required to apply for and obtain a conditional use permit pursuant to City Code § 405.095(B).[48] On December 15, 2021, the City approved Petitioner's Second Conditional Use Permit via Ordinance No. and 1980[49]. City Code § 400.130(G)(1) governs procedures for Conditional Use Permits and is applicable to the Second Conditional Use Permit granted to Petitioner.[50]  Section 400.130(G)(1) requires (1) a building

---

[47] Seg. 16; BOA Record 322-323
[48] Appendix A & Appendix B
[49] Seg. 5 BOA Record 148-157; Appendix D
[50] Appendix B

permit be obtained and (2) the erection or alteration of the real property to begin within one hundred eighty (180) days from the date of the grant of the conditional use permit.[51] Petitioner had until June 13, 2022, to complete these requirements. Petitioner did not obtain a building permit until November 7, 2022,[52] and did not commence any activities whatsoever at the Property until March, 2023.[53]

Because Petitioner did not obtain a building permit until November 7, 2022, and did not commence any activity at the Property until March, 2023, both of which occurred after the June 13, 2022 deadline, the Second Conditional Use Permit expired.[54] Further, Petitioner neither requested nor obtained an extension to the validity of the Second Conditional Use Permit.[55]

Petitioner's building permit, which the City issued on November 7, 2022, expired May 6, 2023, due to Petitioner's failure to commence work under the building permit within one hundred eighty (180) days from the permit's issuance as required by City Code § 500.040(A)(6).[56] Section 500.040(A)(6) states in pertinent part:

> "Every permit issued shall become invalid and expired unless the work on the site authorized by such permit is commenced within one hundred eighty (180) days after its issuance, or if the work authorized on the site by such permit is suspended or abandoned for a period of one (1) year after the time the work is commenced."

Petitioner did not commence work in constructing a building within one hundred (180) days from when the City issued its building permit.[57] Petitioner neither requested nor obtained an extension to the validity of the building permit and, therefore, it also expired.[58]

---

[51] Appendix A & Appendix B
[52] Seg. 16; BOA Record 314-315
[53] Transcript 169:21-23; Seg. 25; BOA Record 457 – 459
[54] Transcript 204:4-17
[55] Transcript 204:18-24
[56] Appendix B
[57] Appendix B; Transcript 201:9-202:4
[58] Transcript 202:5-19

Petitioner was also required to obtain a Certificate of Appropriateness from the Old Town Historic Commission pursuant to City Code § 405.115(A)(1).[59] City Code § 405.135(C) provides, in pertinent part:

> "A certificate of appropriateness shall become void unless construction is commenced within six (6) months of date of issuance or otherwise extended by the [Old Town Historic District Commission]."

Petitioner received approval of its Second Certificate of Appropriateness on April 7, 2022, and was required to commence construction pursuant to this certificate on or before October 7, 2022.[60] The definition of "construction" supplied in City Code Chapter 405, Article III, § 405.112(B) is applicable to determine the validity of the Second Certificate of Appropriateness.[61] City Code Chapter 405, Article III, § 405.112(B) defines construction as "the act of adding an addition to an existing structure or the erection of a new principle or accessory structure on a lot or a property." [62] As evidenced by the photographs and discussed above, Petitioner did not add onto an existing structure, nor did Petitioner erect a new structure.[63] Therefore, Petitioner's Second Certificate of Appropriateness expired, and Petitioner failed to request any extension or apply for a new certificate of appropriateness.[64]

Petitioner's Second Conditional Use Permit, building permit and Second Certificate of Appropriateness all expired prior to the issuance of the Stop Work Order.

V.  **Petitioner's Assertion that Other Definitions of Construction Should Apply Is Incorrect**

As part of its appeal to the Board, Petitioner argued the definition of "construction activity" found in Chapter 510 of the City Code is the applicable definition that applies in this

---

[59] Appendix B
[60] Seg. 15; BOA Record 296-298; Transcript 202:20-203:13
[61] Appendix B
[62] Appendix B
[63] Appendix C; Transcript 199:6-200:17
[64] Transcript 203:2-21

14

case.[65] Chapter 510 contains provisions related to Stormwater Management and defines "construction activity" as "activities subject to NPDES [i.e., National Pollutant Discharge Elimination System] construction permits. These include construction projects resulting in land disturbances of five (5) acres or more. Such activities include, but are not limited to, clearing and grubbing, grading, excavating and demolition."[66] Petitioner argued that because the Project required a NPEDS permit for grading on the Property, that this definition from Chapter 510 titled "Stormwater Management" is the applicable definition to be applied.[67]

Petitioner's argument, however, completely ignores the fact that the City issued the Stop Work Order pursuant to the P.U.D Ordinance, which specifically governs the Project and the timeframe within which construction must be initiated.  This case has nothing to do with the NPEDS permit Petitioner obtained to grade the Property, and the P.U.D. Ordinance does not adopt or otherwise incorporate the definition of "construction activity" set forth in Chapter 510. The determinative question is whether Petitioner started construction within one year after Final Plan approval.  As discussed above, there is substantial evidence to support the Board of Adjustment's determination that the answer to that question is, "No."[68]

Petitioner also asserted the definition of "construction" found in City Code § 405.112(B) applies in this case.  City Code § 405.112 contains zoning regulations that govern the City's "Special District/Old Town Cottleville," and is not a part of the P.U.D. Ordinance.  City Code § 405.112 defines "construction" as, "the act of adding an addition to an existing structure or the erection of a new principal or accessory structure on a lot or property."[69] However, this definition applies only to Article III as is expressly set forth in City Code § 405.112(B), which

---

[65] Transcript 49:7-22
[66] Appendix B; Transcript 49:7-22
[67] Transcript 215:1-23
[68] Appendix A
[69] Appendix B

15

states: "Unless specifically defined below, words or phrases in *this Article* shall be interpreted so as to give them the same meaning as they have in common usage and so as to give *this Article* its most reasonable application." Because the P.U.D. Ordinance is found in Chapter 405, Article V, the definition of "construction" supplied in City Code § 405.112(B) is not applicable thereto.

However, even if the definition of construction supplied in City Code § 405.112(B) applies in this case, there is substantial evidence establishing that Petitioner's activities on the Property (or lack thereof) does not satisfy the requirements of the definition.[70] At no point between May 18, 2022 and May 19, 2023, did Petitioner ever add "an addition to an existing structure," or erect "a new principal or accessory structure on a lot or property." *See* City Code § 405.112(B) (definition of "construction"). Indeed, photographs of the Property introduced during the hearing confirm that no structure existed on the Property when the Stop Work Order was issued.[71] Consequently, there is no existing structure on the Property and Petitioner did not erect a new structure of any type in furtherance of the Final Plan on the Property. Therefore, Petitioner cannot establish "construction," as defined in § 405.112 of the City's Code, began either.

## CONCLUSION

The City issued a Stop Work Order to Petitioner due to Petitioner's failure to begin construction one year after the approval of their Final Plan. Petitioner received approval of their Final Plan on May 18, 2022, and Petitioner failed to begin construction under the plain and ordinary meaning of that word by May 18, 2023.

The record establishes that the only work Petitioner completed with regard to the Project included tree clearing, boring potholes to monitor sole compaction, hydro excavation to

---

[70] Transcript 199:1-200:24
[71] Seg. 6; BOA Record 175-180; Appendix C

Electronically Filed - ST CHARLES CIRCUIT DIV - December 01, 2023 - 05:38 PM

locate utilities, the erection of a job board and the staking of building corners. None of these activities fall within the plain and ordinary meaning of the word "construction" as that term is used in the P.U.D. Ordinance. Petitioner did not take any action within the relevant timeframe to build anything. *See* Appendix C (Photographs of Property on May 19, 2023) Furthermore, Petitioner allowed the Property to be used as a parking lot with no definite time for that use to end, which is further evidence that construction did not begin within the relevant timeframe.

Because construction did not begin between May 18, 2022 and May 18, 2023, Petitioner's Final Plan expired. P.U.D. Ordinance § 405.400 expressly authorizes the City to issue the Stop Work Order because beginning construction at any time after May 18, 2023, would result in a violation of the Final Plan and P.U.D. Ordinance. The City was therefore authorized to issue the Stop Work Order pursuant to P.U.D. Ordinance § 405.400 to prevent Petitioner from beginning illegal construction of the Project after expiration of the Final Plan.

The Board of Adjustment's decision to uphold the Stop Work Order is supported by competent and substantial evidence upon the whole record. Respondents therefore respectfully request this Court affirm the Board of Adjustment's decision.

Respectfully Submitted,

HAMILTON WEBER LLC

/s/  John H. Kilper
    John H. Kilper, #60997
    Jennifer L. Burkhart, #75500
    200 N. Third Street
    St. Charles, MO  63301
    (636) 947-4700 - Telephone
    (636) 947-1743 – Facsimile
    jkilper@hamiltonweber.com
    jburkhart@hamiltonweber.com
    *Attorney for Respondents*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was served this 1st day of December, 2023, by notice of filing through the Court's electronic filing system, to:

John Bradford Goss,  #36266
Daniel S. Peters, #43416
Elizabeth Lum, #59375
SMITHAMUNDSEN LLC
120 South Central Avenue, Suite 700
Clayton, MO  63105
(314) 719-3700 /F:  (314) 719-3710
bgoss@amundsendavislaw.com
dpeters@amundsendavislaw.com
elum@amundsendavislaw.com
*Attorneys for Petitioner*

/s/  John H. Kilper